Good morning, Your Honors. May it please the Court. My name is Stephanie Norton, appearing on behalf of Petitioner Selvan Saban-Cach. With the Court's permission, I would like to reserve two minutes of my time for rebuttal. This case involves three main issues—passed Let's take the first one first. You know, it troubles me every time I read these kinds of cases where the IJA and the BIA say that, well, yeah, there were some incidents, a few incidents, relatively scattered—not to use their terminology, but that's mine—but he didn't seek medical attention. Is there any evidence in the record at all as to the availability of medical attention? And whose burden should that be? Because if we put it on him, we're basically asking him to prove a negative. He has to prove there's no medical facility around, which is, I think you can see it as impractical, if not impossible. So why shouldn't the government in these kinds of cases have to come forward and show there was medical attention of some level available to him? And I say that because I get the feeling, even though we're supposed to defer to the expertise of the IJA and the BIA, I doubt many of these folks have ever been to a third-world country, where they just assume you pick up the phone and they go to the neighborhood family practitioner or the neighborhood internist, or in the case of the I, go to the neighborhood optometrist. It doesn't work that way in a lot of countries. I don't know how big this community is that he's from, but I get the feeling it's not a large metropolitan area. He may not have had the ability to get to any medical facility other than the treatment that he received, which was herbal medicine from, I guess, his grandmother gave it to him. Yes, Your Honor, that's correct. And Mr. Savant testified that the hospital was very far away, and he, as an individual... Can you say what very far means? I'm not sure in terms of the record. There's no measurement of how far his village was from the nearest hospital, but when he was... How big is the village? Excuse me? How big is the village? Is that in the record? I'm not sure the exact size of the village. I think it's a relatively small city, and then he was in a smaller neighborhood within that city. Okay. Ms. Norton, this is one of those cases, is it not, where our review is of both the BIA and the IJ? Yes, Your Honor. And their determination. And the IJ, while saying respondent did not go to the hospital, goes on to say, but was given natural medication by his grandmother. So, we have this kind of disconnect, not a hospital, but what consideration can we give to this natural medication? Because it's not as if there was no treatment rendered. It's a matter of the mode of treatment. Exactly. And that's what Mr. Savant explained, that his grandmother was able to provide him medical care through natural medicines and herbs, and it was natural for him, as part of an indigenous community, to seek that kind of medical care. And so, it would be extremely problematic to suggest that petitioners had to seek professional westernized medical care. Do we have any cases, or do you have any cases you can refer to that has found natural medication to be an accepted form of treatment of some kind, irrespective of whether someone goes to a medical facility? I'm not aware of any cases discussing natural medicine specifically, although the court has said repeatedly that medical care period is not a prerequisite for past persecution. A physical harm isn't a prerequisite for past persecution. But it is an appropriate factor for them to consider. It is one of many factors that can be taken into consideration, but it's not required. And here, there clearly was serious physical injury. The petitioner was beaten to unconsciousness, he was stabbed, and he did both seek and require medical care. And that is one incident. Let's go to quantification. There are at least four episodes of physical attack here, were there not? Yes, your honor, at least four. So the petitioner said that after he dropped out of school, because this gang was threatening him, throwing stones at him. Let's stop right there. It started actually in school. That is the pattern that you are relying upon as probative of persecution. And in fact, according to petitioner, who was credited generally across the board, as I understand it by the IJ, that formed the basis for his desire to eventually drop out of school. Is that right? Yes, that's correct, your honor. He was repeatedly threatened and attacked while he was still in school. And then even though he dropped out of school, there were at least four incidences of physical harm after that, culminating in this, what he described as an assassination attempt, where the gang members broke a glass bottle in his face, stabbed him in the back, and then kicked him until he lost consciousness. And it was only apparently when a group of neighbors intervened that this attack stopped. And petitioner's father declared that he was afraid that his son would have been killed if that hadn't happened. Did petitioner actually show his scar during the IJ hearing? He did, your honor. The petitioner motioned two scars on his forehead, on his arms, and on his lower back. And there were pictures submitted in the record, which I realized by this point, since they've been scanned and are of quite poor quality. When he moved from San Juan to San Pedro, he was in San Pedro how many years? Was it three? It was between three and four years he was in San Pedro. And there was no significant persecution of him while he was in San Pedro, was there? He was not physically harmed. But right before he fled, there were three occasions when he realized that the gang was following him, and he was only narrowly able to avoid them. And those three incidents happened in a period of a few weeks, he testified. And that's when he decided to flee Guatemala for the first time. You referred to the gang as he has referred to it, that's pretty vague, isn't it? And in fact, trying to link it to MS-13, also, you would have to admit, is fairly vague in this record. So the petitioner testified that this gang started as apparently many gangs in Guatemala did as a sort of a local phenomenon, but over time, grew in size and started referring to themselves as MS-13. And the expert report says this is very common. The UN also says that the vast majority of these local gangs in Guatemala are associated with either MS-13 or M18. Well, but even in your brief at page two, you referring to a recently formed gang, you say, which appeared to be part of the infamous MS-13. There's nothing probative that it was, in fact, MS-13. The country conditions evidence suggests that it's certainly more likely than not that it was a part of MS-13. They were using the gang's name. The majority of gangs of the smaller gangs are part of MS-13. But the country condition of this evidence also shows that even local gangs can have quite a far reach. Well, you've anticipated my next question. I mean, MS-13 gets people's attention, but after that's all been said and done, does it matter if there's a gang that has visited violence upon petitioner? Exactly, your honor. I mean, yes, MS-13 has a presence in over two thirds of Guatemala, but the country conditions evidence shows that even these smaller gangs have quite a wide reach and are quite relentless in pursuing their targets. And that's exactly what Mr. Saban experienced. Even after the passage of years, this gang continued to follow him. He was there for four years. Was it four years that he remained after the last encounter or four years total he remained? Four years total. So there were a number of years from the last physical attack to when the gang started following him and pursuing him. And then he fled Guatemala on two occasions. And both times when he was deported, the gang again followed him and that led him to flee a final time. So if the IJ and the BIA, as you believe, got it wrong on past persecution, and I repeat, the IJ made an across the board credibility determination here, crediting the testimony, period. That the respondent testified credibly. I sometimes find it curious that there's not a more particularized adjudication going to credibility at least point by point, but this seems to often be the case. And it is importantly for you, the case here. So if the BIA, if the IJ here got it wrong, affirmed by the BIA that there was no past persecution, we determined there is past persecution. What are the implications of that going forward? First of all, in terms of burden going forward. So if there is past persecution, then Mr. Saban is entitled to a presumption of future persecution. And it's the government's burden to rebut that presumption by showing that he could reasonably relocate. The decision that we... On this record, why wouldn't the government be able to show that? Or why doesn't the record even presented to us establish that it would be reasonable to conclude that he could safely relocate to this other village where he lived for quite a period of time? They did follow him there. They did follow him there. But that seemed to be tied to his initial contact in the first place that he lived, as opposed to a separate group of folks in that second town that sought him out. So in terms of places that Mr. Saban could potentially relocate, he obviously can't go back to his hometown. And he can't now go back to the place where he previously relocated because the gang knows that he was there, was living there. Outside of that area, not only does the gang have the ability to target him and find him, but the only areas that aren't controlled by gangs in Guatemala are these closed ethnic communities that simply wouldn't accept Mr. Saban because... Stop right there. Why would why would he not be able to return to his own ethnic community or a community that's dominated by his own ethnic group? So his own ethnic community is in the area where he was previously attacked and where he tried to relocate unsuccessfully. So I mean, is it the petitioner's position that there is nowhere for me to go in Guatemala? I've been to Guatemala. I know it's not a large country. But rarely will the government countenance a position that there's nowhere that you could go in cases like this and return to your own homeland. Yes, that is what the petitioner testified. And there's two elements to this finding on relocation. And it's not just whether he could safely or theoretically avoid being harmed or killed when he returned somewhere, but whether it's reasonable for him to relocate somewhere. And as an indigenous person who will only be welcomed in certain areas of the country, and even there, would suffer debilitating discrimination that wouldn't allow him to support his disabled wife and young children. It's simply not reasonable for him to relocate anywhere else. But again, the problem you have is he lived in San Pedro for three to four years without facing any persecution. He claims he might have been followed or he suspected that he was being followed. But there was no persecution during those three to four years. Your Honor, it's hard to suggest that being followed is not persecution. I mean, in Blanco, for example, the fact that the petitioners, persecutors, continued to follow him as he tried to relocate throughout the country was considered as part of this overall atmosphere of fear that constitutes persecution. So just because Mr. Saban was lucky enough to avoid the people who were following him, doesn't mean that he was living safely in San Pedro. It would only, as he testified, the gang members knew the neighborhood where he lived. They just hadn't figured out where his exact house was. And it was only a matter of time before they saw him before he saw them. Why should we not regard that as speculative? I mean, given the fact that we have violence visited frequently upon petitioner in the past, and I frankly have a hard time looking at this record and thinking that the IJ and the BIA got it right in terms of past persecution. But moving forward, once he got to San Pedro, it seems to be decidedly different there. No, I mean, it's one thing to be followed, that may not be comfortable, but in and of itself, does that constitute an act of persecution? That certainly contributes to the sense of an atmosphere of oppression and fear. And as the court recently said in Nisimba, living in fear and constant fear is not reasonable. Fearing that, you know, it's only a matter of time before the gang sees you first and follows through on its threats to kill you is not reasonable. And even accepting that, that living in fear is not reasonable. Is this record sufficient to demonstrate that that fear was reasonable? Do we know enough about the gang? And given the fact that the gang has not acted in violent ways with respect to the petitioner, is there enough? Your Honor, the gang did act in violent ways on multiple occasions with respect to the petitioner. He tried to kill him. No, you keep saying the gang. But how do we know that the gang in, what was it, Montefiore, where he previously lived, is the gang in San Pedro? Because petitioner testified that he recognized members of the same gang that had previously persecuted him. And we have to credit his testimony as credible, that he knew that these tried to kill him. And that gang, as recently as last year, tried to run over his brother with a car. So they are clearly still committing acts of violence with impunity. And there's every reason to believe that they would still follow through or try to follow through on their threats to kill Mr. Saban. Two points, but you served some time for rebuttal. So let me just mention them to you and we can discuss it in more detail then. One is the particular social group that you haven't really focused on and the extent to which the record would support a conclusion that this persecution, if you can call it that, is on account of a particularized social group under the VA's law and VA's presence in their own. And second one now, how far away are the two towns, Montefiore and his main town, those two points? Would you like me to focus on those on rebuttal, Your Honor? If you could, yeah. Unless my colleagues have something else. No, I have nothing else. Thank you. Okay. Ms. Schaffner? Good morning. May it please the court, Jane Schaffner for the respondent. Substantial evidence supports the agency's conclusion here that Mr. Saban failed to establish harm rising to the level of persecution. And substantial evidence also supports the conclusion that he failed to establish that internal relocation was unreasonable in Guatemala. I start with a cat claim. My biggest concern is there appears to be a lot of evidence that was not considered by the IJ or the BIA. The country conditions report documenting gang violence and the specific risk by indigenous persons in Guatemala was not Mr. Saban would face serious bodily injury if he were removed. Doesn't that require the court considering it and dealing with it in some way, shape, or form? That's correct. The agency is required to consider all relevant, sorry, all evidence relevant to the possibility of torture. And the IJ in considering the cat claim, we acknowledge did not specifically reference the expert's report, but did generally. In fact, all the IJ did here was to consider the same universe of evidence that was considered for the persecution claim. Isn't that correct? That's correct. The general country conditions evidence that informed the past persecution claim. That really shouldn't be enough, and it shouldn't be enough under Judge Ambrose opinion and Myrie, should it? Which was a cat claim case. That's correct. The immigration judge considered Mr. Saban's particular circumstances giving rise to a potential cat claim and then also referenced the general country conditions evidence. There was more than a thousand pages of country conditions evidence. The IJ mentioned discrimination against indigenous populations, mentioned crime and violence in Guatemala, did not go through the country conditions evidence report. Aren't those deficiencies in and of themselves enough just putting aside the persecution claim here to send the cat claim back for a closer look and for a more detailed analysis? We would argue that the IJ's analysis as adopted by the board is sufficient because the immigration judge acknowledged the general country conditions, the discrimination against indigenous populations, the generalized violence and crime in Guatemala. Because there was more than a thousand pages of country conditions evidence, it was not reasonable to expect the immigration judge to go through each report and discuss it in detail. We need to know that the immigration judge considered it and the fact has a voluminous record. I can be somewhat sympathetic because I know the incredible, and I've written about it, incredible, overwhelming case law. It boggles my mind that immigration judges in the BIA have to deal with. It's humongous, it's unworldly, it's unworkable. But nevertheless, Ms. Norton's client is entitled to a fair hearing and that means that somehow, some way, the IJ and the BIA have to get to the evidence that's put before them. They don't have to write a treatise when it comes time to write the opinion or the decision of the BIA, but we need to be sure that it was considered. Just listening to your summary about what's in those thousand pages and looking at what the IJ and the BIA said to deny the claim, I'm hard put to understand how they could find out there's not past persecution. It seems to me the biggest problem here is the relocation, that's a separate issue. Even the CAD claim, it seems to me, and I wasn't focusing on the CAD claim before the argument, but it seems to me there is substantial evidence to support his CAD claim if a proper MIRI analysis had been undertaken. Certainly, I appreciate your position. We maintain that the... Nice combination. Actually, Judge McKee, she's being kinder to you than I am to them. That's how we brush them off. We just say, we appreciate that. Now go away. You made your point, Teddy. Now go away. And I mean, no disrespect. They do. I know you don't, Ms. Huffner, but my colleagues do. Yeah, we do. We would say that the immigration judge, by referring to petitioner's objective evidence, as opposed to his testimonial evidence, the declarations that he submitted from family members, that by referring to this objective evidence, it shows that there was consideration to the country conditions reports. And significantly to our mind, petitioner has not identified particular evidence from the country reports that would compel reversal of the agency's conclusion that he failed to meet his burden of proof for protection. That's a fair point. You're saying, yeah, the agencies have to review this, but it's on the petitioner to delve into this stuff and pull out of it those things in the evidence, that it's his evidence that would support his position. That seems to me to be a fair response. I asked Ms. Norton about that also. But also one of the problem I have in terms of not considering on the withholding of removal, the BIA didn't even discuss the harm suffered by Mr. Saban's family members. His father was beaten bloody. His sister allegedly was raped. The brother was allegedly run over or attempted to be run over by a car. And the IJ disregards that in a single sentence without any reasoning. And doesn't that call for a redo for the agency to cumulatively consider all the evidence related to the past persecution? We understand and recognize that the board did not mention the harm to the family, but as you know, the immigration judge did. And the immigration judge- In a single sentence. Correct. With no reasoning. Correct. On appeal to the board, however, petitioner did not challenge that finding, did not ask the board to, did not challenge the immigration judge's decision to decline to impute the harm his family suffered to him. And the board again- How much impact though, weight wise, does it have that imputation did not take place? It's still evidence in the record. It still is probative of what was happening and of what this petitioner and his family were exposed to. Doesn't it have some significant weight even without imputation? Certainly it's significant. It's telling here that petitioner described the harm that his father suffered, the harm that his sister suffered. He did not say himself that he was psychologically harmed because of the harm that his family suffered. All of these events are very unfortunate, but he did not say that he himself was harmed in any way psychologically or otherwise by the harm that the members of his family were experiencing. But it does support the conditions for members of the Mayans, the people in his social group. I'm sorry, could I- It does generally support his claim to be a member of a particular social group because I assume all of his family members are the same group. It doesn't necessarily follow, but I assume that's the case. And it may be relevant in terms of whether or not for the CAT claim, the authorities in the community simply are unable to or acquiesce in this kind of First, with respect to the particular social group claim, that's not before the court now. The immigration judge made a particular social group finding, but the board did not affirm that finding. We've only got past persecution and internal relocation with respect to- But the past persecution has to be on account of something. That can't just be because they didn't like the kid. No, that's correct. But before even reaching the on account of question, the agency determined that he failed to establish harm rising to the level of past persecution without then going on to address whether it was on account of. But as to acquiescence, again, we would say that he's failed to identify record evidence that would compel a contrary conclusion. He did not report any of the- All of which is to say, Ms. Schaffner, that if this went back because we believe that there was a showing as to past persecution, the BIA and the IJ would have to reach that question as to particular social group, right? They would have to reach the social group issue and also they would need to give the government the opportunity to rebut the presumption of a well-founded fear. Right. Right. That's correct. So certainly if the court finds that substantial evidence compels the conclusion that he suffered harm rising to the level of persecution, it should be remanded to the agency to make the particular social group and internal relocation findings under the proper burden shifting scheme. Especially when it appears that the BIA applied the wrong standard for government acquiescence. We never require petitioners to show that they were personally harmed by the government officials or reported their harm to the police. When we recognize that's not a requirement, but it's a factor that the agency appropriately considered in its analysis, that it was appropriate to consider how the government would have responded had he reported the incidents. That's why the information relating to his sister's incidents of harm are relevant. We do know that the police came. We know that they took a rest. But even here, sometimes crimes are not prosecuted. Crimes are not solved. And that does not mean just because the government failed to make an arrest or failed to prosecute the crime that they would acquiesce in the harm to petitioner or his family. I have no further questions. No, do I. Thank you. Thank you very much for your time. Thank you. Thank you. Just to address the two points that you raised. Those are the ones you had time to prep for. Yes, I believe Ms. Schaffner mentioned that the issue of particular social group or here, whether the persecution was on account of Mr. Saban's race as an indigenous Mayan is not before the court because the BIA did not make a finding on that issue. In terms of the distance between San Juan and San Pedro, petitioner testified that it was about an hour and a half between taking the bus between those two cities. So if driving at a reasonable speed of 60 miles an hour is an indication, it's around 90 miles. But I would also point out that Guatemala is approximately the size of Virginia. So we're not talking about an area where there really is significant opportunities for someone to relocate, especially when they are being targeted and when they would not be welcome in several areas of the country. So there really is, given the rampant discrimination, given the power of even local gangs to find their targets, there really is nowhere that Mr. Saban could reasonably relocate in Guatemala. And the final point I wanted to make was on the Convention Against Torture analysis. As your honors pointed out, the BIA and the immigration judges cannot just ignore the inquiry that this court has set forth. And they can't just ignore evidence in the record that supports petitioner's claim. Just because the immigration judge used the word objective evidence does not show that she meaningfully considered any of that objective evidence in the record. But on Ms. Schaffner's point that it's really up to the petitioner to pull out all this stuff that's in the record, country reports, and lay that out for them to consider. And I think she's suggesting that wasn't really done here. Leonard, it is the petitioner's burden to show that he would more likely than not be tortured with government acquiescence if removed. But the immigration judge does have to make a factual finding based on the evidence at hand about what is likely to happen when petitioner is removed and whether that legally constitutes torture, as well as about what is likely to happen in terms of the public official's response to that torture and whether that constitutes acquiescence. And that's what the immigration judge didn't do here. She didn't make any factual findings. Is he in custody now? Excuse me? Is he in custody now? He's not. He was released from custody. Okay. And was he represented by counsel before the IJ? Yes, your honor. I represented him before the IJ. Okay. Okay. I'm sorry. So in terms of what the evidence does actually show, I mean, in terms of torture, there is the likelihood of future torture. There's obviously respondents' past experiences of being repeatedly violently attacked by this gang. And this court in Oriana recently found that just one attack and one death threat was itself sufficient to constitute torture. Here you have multiple attacks and a fascination attempt that nearly killed petitioner. So there's his past experiences. There's also the gang's continued attacks on his family. And there's country conditions evidence about how violent and unchecked these gangs can be in terms of their willingness to torture and murder their victims. So the evidence certainly shows it's more likely than not that this petitioner would be subject to torture. I did not follow up on any of your points with respect to Guatemala itself, the proximity of one town to another, its comparative size to Virginia, all of which would seem to be an argument that taken to its logical extension would be that anybody who had been attacked as petitioner alleges that he was, or that I think we have to accept he was given the credibility finding, would be entitled to immigrate to the United States because Guatemala would not be a place where he could be safe anywhere. That seems to be the logical extension of your argument. I would just as a footnote to that add though, as I'm sure you aware, that there's a different regulatory standard now that would place the burden on your client rather than the burden shifting regime that existed before. But as of last year, the burden I believe is on him, correct? That would not, the new regular... Doesn't apply to your guy. It doesn't apply to your client. I understand. I'm just suggesting that this mitigates some of my concern that we get into decision-making that rules out an entire country as a place where a person can relocate. And I don't want to suggest that anyone who was ever attacked by a gang in Guatemala couldn't reasonably relocate. But here, this gang has shown its ability to track the petitioner and the fact that he's indigenous is very important because it limits where he can relocate. Fully understood. I was simply enunciating a policy concern that I have and I think certainly our court would be mindful of in terms of making such determinations. I understand, Your Honor. Unless you have anything else, then I guess we're... Nothing for me. Okay. Thank both counsel. A pretty helpful argument. We don't always get the best or the most helpful argument in immigration cases. And I want to applaud both you, Ms. Norton, and you, Ms. Faulkner. It was a very good argument. And you're not just saying that because you got that pat on the head a little bit ago. Yeah, I patted myself on the head. Oh, that's right. All right. We'll give you one during conference. Ms. Faulkner kind of did. Ms. Norton was not so kind. Unintentional, I'm sure. Thank you both. We'll take matter into advisement. Thank you. Thank you very much.